## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ERNEST HOLGUIN, DAVID GOLDBERG, JAMES KALKSTEIN, ROBERT SMITH, and CAROLE SMITH, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>GENERAL MOTORS, LLC,<br><br>    Defendant. | Civil Action No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Ernest Holguin, David Goldberg, James Kalkstein, Robert Smith, and Carole Smith ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2015 to present Chevrolet Corvette Z06 or 2017 to present Chevrolet Corvette Grand Sport vehicle ("Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by General Motors LLC ("GM" or "Defendant"). Plaintiffs allege as follows:

### INTRODUCTION

1. This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

2. General Motors LLC manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' wheels were defective in design or material.

3. The Class Vehicles are equipped with wheels (a.k.a., rims) that are prone to bending and cracking, without impact damage, and which necessitate costly repairs and replacements. In addition, cracked rims can puncture the tires, causing air leaks and tire blowouts (collectively, the "Wheel Defect.")

1

4.     On information and belief, the Wheel Defect occurs because GM, in designing and manufacturing the Class Vehicles (which are sub-models of the Corvette line), used wheels that are of a cheaper material that is cast, rather than forged. GM also used less material than necessary in order to try to save un-sprung weight (*i.e.*, weight that is not borne by the vehicle's suspension). As a result, the rims are not strong enough and crack under normal driving conditions.

5.     The problem is widespread. In fact, during Car & Driver magazine's long-term review of a 2017 Chevrolet Corvette Grand Sport, three of the Corvette's wheels bent, and the fourth wheel cracked. In this case, repairing two of the wheels, and replacing a third, cost Car & Driver $1,119, which GM refused to cover under warranty.[1] As set forth below, costs to consumers regularly run much higher, and consumers regularly paid over $900 *per wheel* to replace one cracked wheel with an equally defective replacement wheel.

6.     The Class Vehicles' wheels are prone to warping and cracking at extremely low mileages. For example, Plaintiffs Robert and Carole Smith's vehicle was vibrating and shimmying while they were driving their new vehicle away from the dealership for the first time. Likewise, by around 1,100 miles, three out of the four wheels on Plaintiff Goldberg's wheels had bent, costing him $4,700 out of pocket.

7.     The Wheel Defect is inherent in each Class Vehicle and was present at the time of sale.

8.     GM was well aware of the Wheel Defect. In fact, in 2017, a Class Vehicle owner wrote on CorvetteForum.com that "there have been a lot of reports of stock wheels bending on Grand Sports and Z06s here lately, and I've had one of my own front wheels bend on a brand-new Grand Sport. In my situation, there was absolutely no damage, scratch, or even a mark anywhere—the wheel just went out of round with less than 1,000 miles on the car." In 2017, GM *responded* to this Class Vehicle owner with its stock line: blaming the customer for hitting a road hazard and denying the existence of any defect.

---

[1] *See* https://www.caranddriver.com/reviews...pdate-3-review.

2

9.      Although GM was sufficiently aware of the Wheel Defect from pre-production testing, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers, this knowledge and information was exclusively in the possession of GM and its network of dealers and, therefore, unavailable to consumers.

10.     Despite access to aggregate internal data, GM has actively concealed the existence of the defect, telling customers, as cited below, that the wheels are not defective and that the cracked wheels are caused by potholes or other driver error, without any such evidence to support external causes.

11.     GM sells the Class Vehicles with a 3-year, 36,000-mile bumper-to-bumper warranty. However, when class members bring their vehicles to GM's authorized dealerships requesting coverage for the Wheel Defect, GM is systematically denying coverage. As a result, Class Members are paying thousands of dollars out-of-pocket to repair, and if they purchase the replacements from GM, to replace the wheels with equally defective wheels.

12.     The Wheel Defect is material because it poses a serious safety concern. Cracked rims can cause the tire to fail and explode while driving, leading to a sudden loss of control at speed and a potential collision.

13.     The Wheel Defect is also a material fact because consumers incur significant and unexpected repair costs. GM's failure to disclose material facts regarding the Wheel Defect at the time of purchase is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace defective rims.

14.     Had GM disclosed the Wheel Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles, would have paid less for them.

## THE PARTIES

### Plaintiff Ernest Holguin

15.     Plaintiff Ernest Holguin is a California citizen who resides in Benicia, California.

16.     Plaintiff purchased his Corvette primarily for personal, family, or household

use.

17.     In December 2016, Plaintiff purchased a 2017 Chevrolet Corvette Grand Sport from Boardwalk Chevrolet, an authorized GM dealer in Redwood City, California. Plaintiff took delivery of his vehicle in California, and his vehicle is registered in California.

18.     Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff researched the 2017 Chevrolet Corvette Grand Sport by reviewing information on the vehicle from Kelley Blue Book, and by reviewing the website of the authorized GM dealership from which he purchased the vehicle. At the dealership, Plaintiff reviewed the vehicle's window sticker. Plaintiff also test drove a Chevrolet Corvette at an authorized GM dealership and spoke with multiple salespeople. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

19.     GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

20.     In March 2017, with approximately 10,000 miles on the odometer, Plaintiff first discovered a problem with his wheels that continues to plague his vehicle despite *six* wheel replacements. Specifically, he noticed cracks in the rear wheels that were causing the tires to lose air.

21.     On August 18, 2017, with 14,000 miles on the odometer, Plaintiff brought his vehicle to Concord Chevrolet, an authorized GM dealership in Concord, California, complaining that his right rear wheel was cracked and losing air. The dealership confirmed that the wheel was indeed cracked. In response, however, with no evidence to support its claims, the GM dealership told Plaintiff his vehicle must have been damaged by road hazards and refused to cover the necessary repair under warranty. However, Plaintiff is the sole driver of the vehicle, and his vehicle did not strike any road hazards, potholes, or other large road imperfections. Nevertheless, Plaintiff had to pay the GM dealership $1,007.01 to replace one

wheel.

22.     On October 27, 2017, with 23,028 miles on the odometer, Plaintiff returned to Concord Chevrolet complaining that his left rear tire was losing air. The dealership notified Plaintiff that the loss of air was occurring because his left rear wheel had cracked. Plaintiff had two cracks repaired in his rear left wheel at third-party mechanic 1stStop Auto in Brentwood, California. Plaintiff had to pay $150 for this repair.

23.     On February 5, 2018, with 30,027 miles on the odometer, Plaintiff brought his vehicle back to Boardwalk Chevrolet, complaining that his left rear wheel was losing air. The dealership confirmed that the wheel had multiple cracks in the rim and notified plaintiff that he would need to replace the wheel. As a result, Plaintiff had to pay $933.92 for the wheel replacement on this visit.

24.     Just five days later on February 10, 2018, with 30,479 miles on the odometer, Plaintiff brought his vehicle to Concord Chevrolet, complaining that his front wheel had cracked. The dealership balanced all four wheels and replaced the tires at an out of pocket cost to Plaintiff of $2,424.66.

25.     Twelve days after the costly wheel rebalancing and tire replacements, on February 22, 2018, with 30,789 miles on the odometer, Plaintiff's left rear tire was already leaking air. Plaintiff brought this vehicle back to Boardwalk Chevrolet and complained. The dealership found that the left rear tire had multiple cracks and would have to be replaced. Plaintiff had to pay $933.02 to replace the wheel on this occasion.

26.     On September 13, 2018, with 41,281 miles on the odometer, Plaintiff brought his vehicle to Team Chevrolet, an authorized GM dealership in Vallejo, California, complaining that his right rear tire was leaking and losing pressure. The dealership confirmed that the air leak was caused by a crack in the wheel and charged Plaintiff $39.00 for the diagnosis.

27.     On September 24, 2018, with 41,974 miles on the odometer, Plaintiff returned to Team Chevrolet and, per the dealership's instructions, paid $813.35 plus sales tax to

replace the wheel.

28.     On April 10, 2019, with 52,266 miles on the odometer, Plaintiff returned to Team Chevrolet, complaining that his right front tire was losing air. The dealer confirmed that the rim had multiple cracks and that the wheel and tire would need to be replaced. Plaintiff paid $730.00 plus tax for the wheel and tire replacement.

29.     On October 21, 2019, with 62,905 miles on the odometer, Plaintiff returned to Team Chevrolet, complaining that his left front tire's air pressure was low. The dealership confirmed that the front wheel was cracked and notified Plaintiff that his wheel and tire pressure monitoring system ("TPMS") sensor would need to be replaced. However, the replacement wheel was back-ordered. Accordingly, Plaintiff had to pay $405.00 for a rental car in the interim. When the replacement wheel and TPMS sensor arrived, Plaintiff had to pay an additional $783.49 for the repair.

30.     On February 17, 2020, with 67,068 miles on the odometer, Plaintiff brought his vehicle back to Team Chevrolet. Plaintiff again notified the dealership that his right rear tire was losing pressure and asked the dealership to check the wheel rim for cracks. The GM dealership confirmed that the right rear rim was cracked and notified Plaintiff that his wheel would need to be replaced. Plaintiff had to pay $896.60 plus tax for the replacement on that occasion.

31.     At all times, Plaintiff, like other class members, has driven his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff David Goldberg**

32.     Plaintiff David Goldberg is a New Hampshire citizen who resides in Merrimack, New Hampshire.

33.     In June 2019, Plaintiff purchased a 2019 Chevrolet Corvette Grand Sport from MacMulkin Chevrolet, an authorized GM dealership in Nashua, New Hampshire. Plaintiff took delivery of his vehicle in New Hampshire, and his vehicle is registered in New Hampshire.

34.     Plaintiff purchased his Corvette primarily for personal, family, or household use.

35.     Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff did general internet searches regarding the 2019 Corvette Grand Sport, including reviewing GM's official website and an authorized GM dealership's website. At the GM dealership, Plaintiff reviewed the vehicle's window sticker and a brochure regarding the Corvette. Plaintiff also spoke with a salesperson at the GM dealership regarding the Corvette. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

36.     GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

37.     In or around August 2019, with approximately 1,110 miles on the odometer, Plaintiff brought his vehicle back to MacMulkin Chevrolet complaining that his vehicle was vibrating when driving. The dealership inspected Plaintiff's vehicle and discovered that, after only around 1,100 miles of driving, three out of his four wheels were bent. With no evidence to support its claims, the GM dealership told Plaintiff that he must have hit a pothole, and that Plaintiff would have to pay for the replacement rims. However, Plaintiff is the sole driver of the vehicle, and his vehicle did not strike any road hazards, potholes, or other large road imperfections. Nevertheless, Plaintiff had to pay $4,700 to have the wheels replaced at Wheel Lab, a third-party automotive repair facility.

38.     At all times, Plaintiff, like other class members, has driven his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff James Kalkstein**

39.     Plaintiff James Kalkstein is a Michigan citizen who resides in Rochester Hills, Michigan.

40.     In May 2016, Plaintiff purchased a 2016 Chevrolet Corvette Z06 from Buff Whelan Chevrolet, an authorized GM dealer in Sterling Heights, Michigan. Plaintiff took delivery of his vehicle in Michigan, and his vehicle is registered in Michigan.

41.     Plaintiff purchased his Corvette primarily for personal, family, or household use.

42.     Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff reviewed GM's official website regarding the 2016 Corvette Z06. At the GM dealership, Plaintiff reviewed the vehicle's window sticker and a brochure regarding the vehicle. Plaintiff also spoke with a salesperson at the GM dealership regarding the Corvette. Plaintiff believed that the Corvette would be a safe and reliable vehicle.

43.     GM's omissions were material to Plaintiff. Had GM disclosed its knowledge of the Wheel Defect before he purchased his Corvette, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Wheel Defect, Plaintiff would not have purchased his vehicle, or would have paid less for it.

44.     On May 10, 2018, with approximately 15,087 miles on the odometer, Plaintiff brought his vehicle back to Buff Whelan Chevrolet complaining that the rear wheel was cracked. The dealership verified the complaint, and GM covered a portion of the replacement under warranty. However, Plaintiff had to contribute $416.50 out of pocket.

45.     On October 17, 2019, Plaintiff brought his vehicle back to Buff Whelan Chevrolet, again complaining that his right rear wheel had cracked. The dealership verified the concern and replaced the wheel at an out of pocket cost of $729.00 to Plaintiff.

46.     At all times, Plaintiff, like other class members, has driven his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiffs Robert and Carole Smith**

47.     Plaintiffs Robert and Carole Smith are Massachusetts citizens who reside in Eastham, Massachusetts.

8

48.     In July 2018, Plaintiffs purchased a 2019 Chevrolet Corvette Grand Sport LT2 from McMulkin Chevrolet, an authorized GM dealership in Nashua, New Hampshire. Plaintiffs' vehicle is registered in New Hampshire.

49.     Plaintiff purchased his Corvette primarily for personal, family, or household use.

50.     Passenger safety and reliability were important factors in Plaintiffs' decision to purchase their vehicle. Before making their purchase, Plaintiffs reviewed GM's official website regarding the 2019 Corvette Z06. At the GM dealership, Plaintiffs reviewed the vehicle's window sticker and a brochure regarding the vehicle. Plaintiffs also spoke with a salesperson at the GM dealership regarding the Corvette. Plaintiffs believed that the Corvette would be a safe and reliable vehicle.

51.     GM's omissions were material to Plaintiffs. Had GM disclosed its knowledge of the Wheel Defect before they purchased their Corvette, Plaintiffs would have seen and been aware of the disclosures. Furthermore, had they known of the Wheel Defect, Plaintiffs would not have purchased their vehicle, or would have paid less for it.

52.     Immediately after purchase, while driving him from the dealership, the vehicle was vibrating and shimmying. The following day, Plaintiff Robert Smith contacted the dealer and complained about the vibration and shimmy. Without any evidence, the dealer claimed that Plaintiffs must have struck an object or road hazard. However, Plaintiffs had not struck any potholes or other road hazards.

53.     The vibrations and shimmy continued, and Plaintiff Robert Smith complained to the dealership three or four more times within the first two months and 500 to 800 miles of ownership. The dealership repeatedly blamed impact damages, even though Plaintiffs had not struck any road hazards.

54.     In or around September 2018, with approximately 1,500 miles on the odometer, Plaintiff Robert Smith complained to Beard Chevrolet in Hyannis, MA, that the vehicle was vibrating and shimmying. The dealership also blamed road hazards, without any evidence, and

implied that Plaintiffs were racing their vehicle (which they were not).

55.     In or around April or May of 2019, with approximately 2,000 miles on the odometer, Plaintiff Robert Smith complained of the vibration and shimmy to Tracey Chevrolet in Plymouth, MA, and the dealership there accused Plaintiffs of racing the vehicle. Plaintiffs have never raced their vehicle.

56.     On September 25, 2019, with 6,993 miles on the odometer, Plaintiffs had the wheels removed and tested at third-party automotive repair facility Cape Tire. Cape Tire confirmed that all four wheels were bent. As a result, Plaintiffs had to purchase four new Chevrolet Wheels at an out of pocket cost of $1,850 from a vendor in Florida and paid an additional $254.88 for installation. Plaintiffs also had to pay $87.12 for the diagnosis of the bent wheels.

57.     At all times, Plaintiffs, like other class members, have driven their vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Defendant**

58.     Defendant General Motors LLC is a Delaware limited liability company with its principle place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is registered to do business in the State of Delaware. The sole member and owner of General Motors LLC is General Motors Holdings LLC.  General Motors Holdings LLC is a Delaware limited liability company with its principle place of business in the State of Michigan.  General Motors Holdings LLC's only member is General Motor Company, a Delaware corporation with its principal place of business in the State of Michigan.  General Motors Company has 100% ownership interest in General Motors Holdings LLC.

59.     General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Delaware.  General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

60.     At all relevant times, Defendant was and is engaged in the business of

designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

## JURISDICTION AND VENUE

61.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

62.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that plaintiffs would ordinarily expect to try them in one judicial proceeding.

63.     This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Delaware.

64.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, GM's state of incorporation.

## FACTUAL ALLEGATIONS

65.     Since 2014, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles. GM has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in Delaware and nationwide. GM warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

66.     The wheel is a large metal circle on which the tire is placed. The wheel helps create the shape of the tire and allows it to be mounted to the vehicle.

67.     GM equipped the Class Vehicles with cast aluminum alloy rims. Figure one, below, shows the OEM rims for the Chevrolet Corvette Grand Sport.



68.     The Vehicles' wheels are prone to warping and cracking at extremely low mileages. For example, Plaintiffs Robert and Carole Smith's vehicle was vibrating and shimmying immediately after purchase, and Plaintiff Goldberg had to pay $4,700 to replace three of his wheels with only approximately 1,100 miles on the odometer.

69.     The following complaint to NHTSA describes the circumstance well:

> Noticed a vibration in the car at highway speeds. Took the vehicle into the dealer and was told that the wheel was bent. Service manager stated that this was happening to many Corvettes and was due to the stiffness of the tire and the weakness of the factory wheel. GM has denied a claim under warranty.

*See* paragraph 41(l), *infra*.

70.     On information and belief, the Wheel Defect occurs because GM, in designing and manufacturing the Class Vehicles (which are sub-models of the Corvette line), used wheels that are of a cheaper material that is cast, rather than forged. GM also used less material than necessary in order to try to save un-sprung weight (*i.e.*, weight that is not borne

by the vehicle's suspension). As a result, the rims are not strong enough and crack under normal driving conditions.

71.     The problem is widespread. In a section entitled "Wheel Woes," Car & Driver magazine reported that, during its long-term review of a 2017 Chevrolet Corvette Grand Sport, the vehicle suffered three bent rims and a $1,119 repair bill:

> Shortly after its first trip to the test track, however, the Grand Sport showed signs of an ailment that would dog us throughout our time with the car. At just under 6500 miles we discovered that three of its wheels were bent. Two were repaired, but one was cracked and had to be replaced. In all, that was an $1119 trip to the Corvette cobbler, none of which was covered by warranty.[2]

72.     The Wheel Defect alleged is inherent in and the same for all Class Vehicles.

**The Wheel Defect Poses a Serious Safety Concern**

73.     The Wheel Defect is material to consumers because it presents a serious safety concern. Cracked rims can cause the tire to fail and explode while driving, leading to a sudden loss of control at speed and a potential collision. In addition, bent rims can cause the vehicle to vibrate which makes the vehicle less stable and can cause driver distraction.

**GM Had Superior and Exclusive Knowledge of the Wheel Defect**

74.     GM is aware of the Wheel Defect and tells its customers that the wheels are not defective and that the cracks are caused by the drivers. GM is also refusing to cover the Wheel Defect under warranty.

75.     Corvette owners communicate through online forums such as www.CorvetteForum.com. GM monitors these online forums and communicates with its customers. For example, on August 31, 2017, a Corvette Grand Sport owner wrote:

> There have been a lot of reports of stock wheels bending on Grand Sports and Z06s here lately, and I've had one of my own front wheels bend on a brand new Grand Sport. In my situation, there was absolutely no damage, scratch or even a mark anywhere—the wheel just went out of round with less than 1,000 miles on the car.

---

[2] https://www.yahoo.com/news/redemption-2017-chevrolet-corvette-grand-202000878.html

Why is this happening, is Chevy aware of this happening on more than an isolated occurrence, and what is being done to remedy the situation?[3]

76.     On October 18, 2017, GM responded by denying that there had been a "rash" of wheel failures, denying the existence of a defect, and blaming the customer: "A frequent sequence of events is that a wheel gets bent by a road hazard but the damage is initially undetectable to the driver…. Over time fatigue cracks can form after thousands or even millions of cycles."[4] With respect to a remedy, GM only stated that "we will continuously improve our designs and validation procedures based on how the world is changing."

77.     The fact that GM responded to class members' complaints online in 2017 conclusively establishes GM's knowledge.

78.     To date, GM continues to refuse to cover the Wheel Defect under warranty and has not issued any relief to the customers who have had to pay thousands out-of-pocket as a result.

79.     GM also monitors customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

80.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, GM knew or should have known of the many complaints

---

[3] https://www.corvetteforum.com/forums/ask-tadge/4036656-asked-grand-sport-z06-wheels-bending.html

[4] https://www.corvetteforum.com/forums/ask-tadge/4055813-answered-grand-sport-z06-wheels-bending.html

about the Wheel Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Wheel Defect.

81.     The following are some examples of the scores of complaints concerning the Wheel Defect available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that GM, through its network of dealers and repair technicians, was made aware of the cracked rims. In addition, the complaints indicate that despite having knowledge of the defect and the exact vehicles affected, GM blamed the customer and refused to honor its 3-year, 36,000-mile bumper-to-bumper warranty.

    a.  **DATE OF INCIDENT:** July 20, 2017
        **DATE COMPLAINT FILED:**  September 21, 2017
        **NHTSA/ODI ID:** 11024830
        **SUMMARY:** MY 2016 CORVETTE STARTED HAVING HIGH FREQUENCY VIBRATIONS IN STEERING WHEEL AND INTERIOR PANELS WITH UNDER 7900 MILES OF SERVICE. I COMPLAINED TO THE DEALERSHIP SERVICE DEPARTMENT ABOUT THE PROBLEM AND FOUND FRONT WHEELS TO BE BENT AND COULD NOT BALANCE THE WHEELS PROPERLY. THE DEALERSHIP ADVISED ME TO TAKE MY CORVETTE TO ANOTHER DEALERSHIP THAT HAD BETTER EQUIPMENT THAN THEM. THE SECOND DEALERSHIP INSPECTED MY CORVETTE AND INFORMED ME THAT ALL FOUR WHEELS ARE BENT AND CANNOT BALANCE THEM PROPERLY. NEITHER DEALERSHIP WILL REPLACE THE WHEELS UNDER WARRANTY. THUS FAR, GM AS WELL, WILL NOT REPLACE WHEELS UNDER WARRANTY. I ATTEST THAT I HAVE NOT DRIVEN MY CORVETTE ABNORMALLY NOR HAVE HIT OBSTRUCTIONS OR POT HOLES. I HAVE NEVER DRIVEN MY CORVETTE ON ROUGH, GRAVEL OR DIRT ROADS. I DO BELIEVE THIS IS A VERY SERIOUS SAFETY PROBLEM THAT CHEVROLET AND GM SHOULD ADDRESS BEFORE SOMEONE HAS A TERRIBLE ACCIDENT BECAUSE OF THESE WHEELS!

    b.  **DATE OF INCIDENT:** August 19, 2017
        **DATE COMPLAINT FILED:** September 20, 2017
        **NHTSA/ODI ID:** 11024700
        **SUMMARY:** BOTH LEFT WHEELS ON MY 2017 GRAND SPORT BENT IN NORMAL DRIVING OVER NORMAL ROADS. IN RESEARCHING THE ISSUE, THIS SEEMS TO BE A RECURRING PROBLEM WITH THE STOCK WHEELS ON 2017-2018 CORVETTE GRAND SPORTS AND 2015-18 CORVETTE Z06S. GM AGREED TO REPLACE THE FRONT WHEEL, BUT THE DEALER DIDN'T REALIZE THE REAR WAS ALSO BENT (NO VISIBLE DAMAGE TO EITHER WHEEL, THE WHEELS ARE JUST NOT

STRONG ENOUGH). GM IS NOW CLAIMING THEY WON'T FIX/REPLACE THE REAR WHEEL. CAR VIBRATES BECAUSE OF THE BENT WHEEL.

c. **DATE OF INCIDENT:** October 13, 2017
**DATE COMPLAINT FILED:** October 20, 2017
**NHTSA/ODI ID:** 11035178
**SUMMARY:** TL* THE CONTACT OWNS A 2015 CHEVROLET CORVETTE. WHILE THE CONTACT WAS HAVING TIRES INSTALLED AT BILL STASEK CHEVROLET (700 W DUNDEE RD, WHEELING, IL), HE WAS INFORMED THAT ALL THE RIMS WERE CRACKED AND THE REAR PASSENGER WHEEL WAS LEAKING. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS APPROXIMATELY 13,466.

d. **DATE OF INCIDENT:** December 20, 2017
**DATE COMPLAINT FILED:** October 18, 2018
**NHTSA/ODI ID:** 11141356
**SUMMARY:** CRACKED REAR WHEEL. I PURCHASED THE CAR USED AND THIS WAS DISCOVERED DURING AN INSPECTION.

e. **DATE OF INCIDENT:** January 8, 2018
**DATE COMPLAINT FILED:** January 10, 2019
**NHTSA/ODI ID:** 11166176
**SUMMARY:** BOTH OF MY OEM REAR WHEELS (SPECTRA GRAY - 10 SPOKE), HAVE DEVELOPED CRACKS REQUIRING REPLACEMENT AT MY EXPENSE. DESPITE MY CORVETTE BEING ON WARRANTY AND A HIGH PERFORMANCE, SPORTS CAR WHICH IS REGULARLY SERVICED, THE CHEVROLET DEALERSHIP REFUSES TO REPLACE THESE WHEELS, EXCEPT AT MY EXPENSE, CITING THAT POOR ROAD CONDITIONS IN CALIFORNIA ARE BLAME FOR THE FRACTURES, RUNNING HORIZONTALLY ON THE RIM LIP. THE FRACTURES CREATE A VERY DANGEROUS SITUATION GIVEN HIGH TORQUE LEVELS, LOW PROFILE TIRES WITH A WIDE STANCE. THE TIRES AND THE SUSPENSION ARE DESIGNED FOR HIGH PERFORMANCE, AND HIGH G FORCE, BUT WHEELS ARE APPARENTLY FLAWED FOR THE DESIGNED TOLERANCES IMPOSED BY DRIVING A HIGH PERFORMANCE CORVETTE. MY CAR RAPIDLY LOSS AIR PRESSURE AT FREEWAY SPEEDS AND THE AIR PRESSURE WARNING LIGHT ACTIVATED IN BOTH OCCASIONS, WARNING OF THE HAZARDOUS CONDITION.

f. **DATE OF INCIDENT:** February 2, 2018
**DATE COMPLAINT FILED:** February 6, 2018
**NHTSA/ODI ID:** 11067302
**SUMMARY:** I PURCHASED AN OPTIONAL CHROME WHEEL UPGRADE WHICH WAS DELIVERED WITH NEW VEHICLE. RIGHT REAR WHEEL CRACKED AND LOST AIR PRESSURE AFTER 4,000 MILES, LEFT REAR

WHEEL CRACKED AND LOST AIR PRESSURE AFTER 6,800 MILES.

g. **DATE OF INCIDENT:** June 11, 2018
**DATE COMPLAINT FILED:**  July 5, 2018
**NHTSA/ODI ID:** 11109750
**SUMMARY:**  BOTH  REAR  WHEELS  DEVELOPED  CRACKS
APPROXIMATELY TWO INCHES LONG FROM THE INSIDE EDGE
TOWARD THE MIDDLE OF THE WHEEL. THE CRACKS IN BOTH
WHEELS WERE SIMILAR IN SIZE AND LOCATION. MILEAGE WHEN
NOTICED WAS 24,000. NUMEROUS REPORTS OF THE SAME ISSUE ARE
BEING   REPORTED   ON   CORVETTE   RELATED   WEB   SITES.

h. **DATE OF INCIDENT:** August 4, 2018
**DATE COMPLAINT FILED:** September 27, 2018
**NHTSA/ODI ID:** 11131995
**SUMMARY:** HAD 3 OF THE 4 RIMS BEND, PER THE DEALER
DIAGNOSIS, FOR NO APPARENT REASON. CAR HAD 2,000 MILES ON
IT. IT SEEMS TO BE A SYSTEMIC PROBLEM. THERE ARE MULTIPLE
POSTS ABOUT THIS ISSUE, ALONG WITH THE WHEELS CRACKING
FOR NO REASON, AT THE FOLLOWING INTERNET FORUM;

HTTPS://WWW.CORVETTEFORUM.COM/FORUMS/C7-GENERAL-
DISCUSSION-142/

IN MY INSTANCE THE CAR DROVE FINE THE EVENING BEFORE (I'D
ACTUALLY PICKED IT UP FROM THE DEALER THE SAME DAY AS
THEY REPAIRED ANOTHER ISSUE). GOT IN THE CAR THE NEXT
MORNING TO GO TO WORK AND NOTICED THE BAD VIBRATION. I
THOUGHT A WHEEL WEIGHT HAD FALLEN OFF. TOOK IT TO THE
DEALER AND AFTER DIAGNOSIS THEY INFORMED ME THAT 3 OF THE
4 RIMS WERE BENT (BOTH PASSENGER SIDE AND DRIVER REAR).

i. **DATE OF INCIDENT:** August 5, 2018
**DATE COMPLAINT FILED:** October 18, 2018
**NHTSA/ODI ID:** 11141268
**SUMMARY:** GM IS PUTTING DEFECTIVE WHEELS ON GRAND SPORT
AND Z06 CORVETTES. THESE WHEELS WILL NOT WITHSTAND
NORMAL DRIVING ON ANY HIGHWAY. THE ISSUE IS THAT THESE
WHEELS BEND ON IMPACT, BE IT EXPANSION JOINTS ALONG
BRIDGES OR SMALL IMPERFECTIONS IN THE ROADWAY THAT
OTHER CARS HANDLE EVERY DAY.

THE ISSUE IS THAT GM SAYS THESE ARE ROAD HAZARDS AND THEY
ARE NOT RESPONSIBLE. THE WHEELS WERE NOT ENGINEERED TO
TAKE NORMAL DRIVING ON ROADS ANYWHERE.

THIS STARTED IN JUNE AFTER A TRIP I TOOK AND THE CAR PICKED

UP A VIBRATION. TOOK IT TO S DEALER AND HE SAID THE WHEELS WERE BENT AND NOT COVERED UNDER WARRANTY AND WOULD SELL ME NEW ONES 2 FRONT WHEELS FOR ABOUT $1800. I THEN TOOK THE CAR HOME AND TOOK THE FRONT WHEELS OFF AND HAD THEM STRAIGHTENED AT A COST OF $110 EACH. I THOUGHT THAT TOOK CARE OF THE PROBLEM SO WE DROVE THE CAR ON ANOTHER TRIP TO NOVA SCOTIA, CANADA. WE WERE ON A TRIP AND LOST AIR IN THE LEFT FRONT TIRE (PICTURE BELOW) IT HAD WORN ALL THE WAY DOWN THROUGH ALL THE BELTS DUE TO THE WHEELS BEING BENT AGAIN. SEE ALL 3 PICTURES.

THESE WHEELS ARE A SAFETY HAZARD FOR THESE CARS TO USE ON PUBLIC HIGHWAYS AS THEY DEVELOP CRACKS AND CAUSE SEVERE TIRE WEAR IN SHORT PERIODS OF TIME.

I HAD ANOTHER SET OF BRAND NEW WHEELS AT HOME. I HAD TO COME BACK HOME AND GET THEM AND TAKE THEM BACK TO CANADA TO GET MY CAR HOME. ON THE 1700 MILE TRIP BACK THE CAR DEVELOPED A VIBRATION AND WHEN I TOOK IT BACK TO MY TIRE DEALER HE SAID THAT THE RIGHT FRONT WHEEL WAS BENT.

THE BIG ISSUE IS GM DOES NOT TRACK THESE ISSUES IF YOU DO NOT BUY THE NEW WHEELS FROM THEM AND IT GOES UNREPORTED. A FRIEND OF MINE WHO HAS LESS THAN 5000 MILES ON HIS 2019 NEEDS TO BUY 4 WHEELS AND 4 TIRES AND THE DEALER EVEN TOLD US THERE WERE 2 PEOPLE THE WEEK BEFORE THAT HAD BENT RIMS ON I-71.

j.  **DATE OF INCIDENT:** August 25, 2018
    **DATE COMPLAINT FILED:** November 2, 2018
    **NHTSA/ODI ID:** 11145056
    **SUMMARY:** AFTER DRIVING THE CAR THE TIRE PRESSURE WARNING CAME ON AND WE STARTED NOTICING THE TIRE PRESSURE LEAKING ON THE RIGHT REAR OF MY WIFE GRAND SPORT CORVETTE, THE WHEEL WAS TAKEN OFF TO INVESTIGATE THE CAUSE OF LEAK. IT WAS DISCOVERED THAT THERE WAS A CRACK ALONE THE BEAD RING AREA OF THE INSIDE DRUM AREA OF THE WHEEL. THE DEALERSHIP REFUSED TO COVER UNDER WARRANTY AND DIDN'T OFFER REPAIRS. THE WHEEL WAS TAKEN TO A REPUTABLE WHEEL REPAIR SHOP WITH A GUARANTEE ON THE REPAIR. AFTER DRIVING THE CAR APPROXIMATELY 1000 MILE THE SAME WHEEL STARTED TO LEAK AGAIN. AFTER REMOVING THE WHEEL THERE WAS ANOTHER CRACK APPROXIMATELY 180 DEGREES FROM THE REPAIRED CRACK. AFTER REFUSING TO DRIVE THE VEHICLE TO THE DEALERSHIP WITH A CRACKED WHEEL, IT WAS REMOVED FROM THE CAR AND TAKEN TO THE DEALERSHIP AND ALSO CALLED THE GM PRIORITY CARE AT 866-636-2273. GM PRIORITY CARE GAVE ME THE CASE NUMBER 8-4778215369 . THE

DEALERSHIP STILL REFUSED TO COVER THE WHEEL UNDER WARRANTY BUT OFFERED TO SELL ME ANOTHER WHEEL FOR $250. THE VEHICLE CURRENTLY HAS 19000MILES AND IS MY WIFE'S DAILY DRIVER FOR WORK. THE CAR HAS NOT BEEN ABUSED OR INVOLVED IN ANY ACCIDENTS. IT HAS BEEN PAINTED DUE TO SCRATCHES FROM TORNADO WIND DAMAGE. I TOOK PICTURES BEFORE THE REPAIR WAS MADE AND ADDITIONAL PICTURE OF THE SECOND CRACK IN THE SAME WHEEL. IN MY OPINION THE DEALERSHIP SHOULD HAVE REPLACED THE WHEEL WHEN THE FIRST CRACK OCCURRED. NOW I HAVE NO CONFIDENCE IN THE QUALITY OF THE GRAND SPORT WHEELS AND WILL REFUSE THEIR OFFER OF GETTING A WHEEL FOR $250. AFTER CHECKING WITH AN AFTERMARKET WHEEL COMPANY FOR REPLACEMENT WHEELS, THEY NOTIFIED ME THAT GM IS AWARE THERE IS AN ISSUE WITH THE GRAND SPORT WHEEL AND THAT I SHOULD TAKE IT TO THE DEALERSHIP FOR REPLACEMENT. THE CAR IS CURRENTLY NOT SAFE TO DRIVE UNTIL I GET A REPLACEMENT WHEEL. SEE ATTACHED PHOTOS OF THE FIRST AND SECOND CRACK IN THE WHEEL.

k.  **DATE OF INCIDENT:** September 14, 2018
    **DATE COMPLAINT FILED:** September 26, 2018
    **NHTSA/ODI ID:** 11131647
    **SUMMARY:** WHEN I TOOK THE CAR INTO A DISCOUNT TIRE STORE TO HAVE NEW TIRES PUT ON THE BACK AT ABOUT 15,600 MILES ON THE CAR CRACKS WERE FOUND ON THE INSIDE RIM WHERE TIRE BEAD SEALS OF BOTH BACK WHEELS. PROBLEM WAS IMMEDIATELY REPORTED TO DEALER WHO VERIFIED CRACKS, BUT DEALER AND GM REFUSED TO REPLACE UNLESS I PURCHASE NEW WHEELS FOR DISCOUNTED PRICE OF $1,100.00 FOR REAR WHEELS ONLY. SPOKE WITH REPRESENTATIVES OF GM ENGINEERING AND FOUND PROBLEM IS A KNOWN ISSUE WITH REAR WHEEL CRACKING GOING BACK SEVERAL YEARS WITH CAST CHINA MADE WHEELS ON CORVETTE Z06 AND ZR1 MODELS. I WAS TOLD GM CORVETTE CHIEF ENGINEER HAS POSTED INFORMATION ON THE WHEEL CRACKING PROBLEM ON CORVETTE FORUM AND ONLY WAY TO NOT HAVE WHEEL CRACKING PROBLEM ON REPLACEMENT WHEELS WOULD BE TO NOT DRIVE ON ROADS WITH BUMPS OR POT HOLES. THEY AGREED THIS WAS NOT REALISTIC BUT GM STANDS FIRM ON PAYMENT FOR NEW WHEELS WITH NO ASSURANCE THIS WILL SOLVE THE PROBLEM. MY COMPLAINT WAS CLOSED AT GM AS CUSTOMER DECLINED REDUCED PRICE OFFER AND IS DISSATISFIED. CRACKING WHEELS SHOULD BE A MAJOR SAFETY CONCERN AND ESPECIALLY WITH CARS THAT HAVE THIS MUCH POWER TO THE WHEELS AND ARE CAPABLE OF THE SPEEDS THESE MODEL CARS CAN OBTAIN. THIS IS TOTALLY IRRESPONSIBLE OF GM TO ALLOW THIS TO HAPPEN AND NOT RECALL THE WHEELS AND REPLACE THEM WITH ONES THAT DO NOT CRACK, ESPECIALLY ON CARS WITH SUCH LOW MILEAGE.

l. **DATE OF INCIDENT:** September 25, 2018
   **DATE COMPLAINT FILED:** December 17, 2018
   **NHTSA/ODI ID:** 11161931
   **SUMMARY:** NOTICED A VIBRATION IN THE CAR AT HIGHWAY
   SPEEDS. TOOK THE VEHICLE INTO THE DEALER AND WAS TOLD
   THAT THE WHEEL WAS BENT. SERVICE MANAGER STATED THAT
   THIS WAS HAPPENING TO MANY CORVETTES AND WAS DUE TO THE
   STIFFNESS OF THE TIRE AND THE WEAKNESS OF THE FACTORY
   WHEEL. GM HAS DENIED A CLAIM UNDER WARRANTY.

m. **DATE OF INCIDENT:** October 17, 2018
   **DATE COMPLAINT FILED:** December 13, 2018
   **NHTSA/ODI ID:** 11161140
   **SUMMARY:** FOUR REAR WHEELS HAVE CRACKED LEAKING AIR AND
   HAVE NO EXTERNAL DAMAGE FROM ROAD HAZARDS. TWO WERE
   REPLACED UNDER THE NEW CAR WARRANTY AND TWO WERE
   REPLACED UNDER GM'S PURCHASED EXTENDED WARRANTY. THE
   FIRST ONE, RIGHT REAR, CRACKED ON 11/19/16 WITH 18,843 MILES ON
   THE CAR. THE SECOND ONE,LEFT REAR, CRACKED ON 8/23/17 WITH
   24,332 MILES ON THE CAR. THE THIRD ONE,LEFT REAR, CRACKED ON
   8/14/18 WITH 34,854 MILES ON THE CAR. THE FOURTH ONE, RIGHT
   REAR, CRACKED ON 10/17/18 WITH 39,501 MILES ON THE CAR.
   CALLING THE GM HOT LINE I WAS TOLD TO CONTACT MY GM
   SERVICE DEPARTMENT IN REGARDS TO THIS ISSUE. THEY TOLD ME
   THE THE WHEEL WAS DESIGNED TO CRACK TO PROTECT THE REAR
   SUSPENSION !!! THIS IS A HUGE SAFETY ISSUE. WHAT WOULD
   HAPPEN IF THAT CRACK LEAD TO A WHEEL FAILURE AT SPEED? I
   HAVE ALL MY GM SERVICE STATEMENTS TO BACK THESE FACTS UP.
   GM NEEDS TO CORRECT THE PROBLEM!

n. **DATE OF INCIDENT:** October 31, 2018
   **DATE COMPLAINT FILED:** January 5, 2019
   **NHTSA/ODI ID: 10954629**
   **SUMMARY:** CRACKED WHEEL AFTER DRIVING OVER SMALL
   POTHOLE ON THE INTERSTATE CAUSING CRACK IN RIM AND SLOW
   LOSS OF TIRE AIR PRESSURE. CRACK IN REAR WHEEL INBOARD
   FLANGE, WHEEL WAS NOT BENT OR WARPED.

o. **DATE OF INCIDENT:** November 1, 2018
   **DATE COMPLAINT FILED:** November 14, 2018
   **NHTSA/ODI ID:** 11151459
   **SUMMARY:** TL* THE CONTACT OWNS A 2016 CHEVROLET
   CORVETTE. THE CONTACT STATED THAT THERE WAS A FAILURE
   CONCERNING THE REAR OEM FACTORY RIMS. THE CONTACT
   STATED THAT THE METAL WAS NOT STRUCTURALLY SOUND AND
   THERE WERE CRACKS IN THE REAR PASSENGER SIDE WHEEL. THE

FAILURE LED TO LOW TIRE PRESSURE. THE DEALER (GEORGE MATICK CHEVROLET, 14001 TELEGRAPH RD, REDFORD CHARTER TWP, MI 48239, (313) 531-7100) REPLACED THE OEM FACTORY RIM. THE DEALER ALSO MENTIONED THAT THEY RECEIVED SEVERAL COMPLAINTS FOR THE SAME MODEL, BUT VARIOUS YEARS, CONCERNING THE OEM REAR RIMS CRACKING AND THE LOW TIRE PRESSURE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS NOT AVAILABLE. *TT *TR

p.  **DATE OF INCIDENT:** November 1, 2018
    **DATE COMPLAINT FILED:** November 2, 2018
    **NHTSA/ODI ID:** 11145000
    **SUMMARY:** 2017-2019 CORVETTE GRAND SPORT HAS A HIGH NUMBER OF REPORT INSTANCES OF RIMS CRACKING AND BENDING THAT FORUM MEMBERS FEEL IS NOT NORMAL, NOT DUE TO HITTING POTHOLES OR ANYTHING. I HAD NEVER HIT ANY POTHOLES OR ANYTHING HARD, AND WHILE HAVING MY TIRES CHANGED, THE SHOP SHOWS ME A CRACK IN THE RIM. ON THE BLOG SITE "CORVETTE FORUM", THERE'S NUMEROUS PEOPLE AND PICTURES OF PEOPLE SHOWING THEIR CRACKED OR BENT RIMS. GM IS TELLING PEOPLE THIS IS NORMAL WEAR AND TEAR AND NOT DEALING WITH IT. THIS IS NOT NORMAL. SEVERAL PEOPLE HAVE REPORTED MULTIPLE TIRES BENT OR CRACKED. PLEASE INVESTIGATE. I'M SURE GM DOES NOT HAVE ACCURATE DATA, PEOPLE MOST PEOPLE REPORT THE DEALER TURNS THEIR CLAIM AWAY AS NOT BEING COVERED, SO IT'S NOT GETTING FULLY REPORTED. THIS APPEARS TO BE A PROBLEM ONLY WITH THE GRAND SPORT MODEL.

q.  **DATE OF INCIDENT:** December 20, 2018
    **DATE COMPLAINT FILED:** December 21, 2018
    **NHTSA/ODI ID:** 11163031
    **SUMMARY:** I HAD A SLOW LEAK IN A REAR TIRE ON A Z06 WHEEL. THE TIRE SHOP FIXED THE LEAK AND INFORMED ME THE WHEEL WAS BENT. THE CAR WAS BOUGHT NEW AND HAS ONLY 2000 MILES ON THE ODO. I CANNOT RECALL HITTING A LARGE POTHOLE OR RUNNING OVER ANYTHING

r.  **DATE OF INCIDENT:** January 2, 2019
    **DATE COMPLAINT FILED:** February 13, 2019
    **NHTSA/ODI ID:** 11179916
    **SUMMARY:** WE HAVE HAD TO REPAIR THEN REPLACE 2 REAR CRACKED RIMS IN THE 1.5 YEARS WE HAVE OWNED THIS VEHICLE. THE FIRST ONE WAS 3 MONTHS AFTER PURCHASING IT AND THE SECOND ONE WAS IN JANUARY 2019. AFTER NOTICING BOTH TIMES THAT FIRST THE LEFT TIRE WAS LOSING AIR A HAIRLINE CRACK WAS NOTICED ON THE INSIDE OF THE RIM. WE HAD IT REPAIRED AND IT DID NOT LAST SO FOR SAFETY REASONS WE NEEDED TO

REPLACE IT. THE SAME THING HAPPENED WITH THE RIGHT SIDE IN LATE 2018. IT WAS AGAIN SUGGESTED WE REPAIR IT, THEN AGAIN THE REPAIR DID NOT HOLD AND WE NEEDED TO REPLACE.

s.   **DATE OF INCIDENT:** January 14, 2019
     **DATE COMPLAINT FILED:** January 29, 2019
     **NHTSA/ODI ID:** 11172809
     **SUMMARY:** 2 BENT WHEELS UNDER (BETTER THAN) NORMAL DRIVING CONDITIONS ON MY 2017 CORVETTE GRAND SPORT. GARAGE KEPT/COVERED. PRISTINE 2-YEAR-OLD CAR WITH 7000 MILES. SERVICE DEPT ALERTED ME TO THE BENDS DURING SCHEDULED MAINTENANCE AND WHILE INVESTIGATING A PULSING PROBLEM IN THE FRONT BRAKE ROTORS.

     THE VEHICLE IS HARDLY EVER DRIVEN, HAS NEVER SEEN ROUGH ROADS/CITY STREETS/BAD WEATHER/ETC. THE VEHICLE HAS NEVER BEEN "TRACKED" OR OTHERWISE ABUSED. THIS IS A "SUMMER ONLY," WEEKEND VEHICLE THAT HAS BEEN IMPECCABLY MAINTAINED.

     THERE ARE NO VISIBLE SCUFFS/SCRAPES/BENDS/BULGES OR OTHER DAMAGE TO THE TIRES OR WHEELS. NEVER HIT ANY POTHOLE/ROAD HAZARD/DEBRIS, *EVER.*

     BASED ON RECENT ONLINE RESEARCH AND INFORMATION FROM THE SERVICE MANAGER, I'M NOW CONCERNED THAT THESE WHEELS WILL TOTALLY CRACK OR OTHERWISE DEFORM WHILE DRIVING. THIS IS AN ACCIDENT WAITING TO HAPPEN.

     AFTER OPENING A CASE (9-5012193448) AND OVER AN HOUR ON THE PHONE, GM HAS DENIED A WARRANTY CLAIM AND WILL NOT FURTHER DISCUSS/ESCALATE THIS ISSUE. GM WOULD NOT PROVIDE A DESCRIPTION OR COPY OF THE METHOD USED TO DETERMINE "DEFECT VS.DAMAGE", OR A WRITTEN COPY OF THE EVALUATION MADE BY THE REGIONAL WARRANTY REP.

     GM REFUSES TO DISCLOSE ANY INFORMATION REGARDING OTHER INSTANCES OF THIS PROBLEM, WILL NOT REPLACE/REPAIR THE DEFECTIVE WHEELS, AND WILL NOT PAY FOR A SUITABLE/COMPARABLE 3RD PARTY REPLACEMENT.

     I'VE ALSO READ ABOUT OTHER OWNERS HAVE THE SAME ISSUES VIA THESE LINKS:

     HTTPS://WWW.CARANDDRIVER.COM/REVIEWS/A23705281/2017-CHEVROLET-CORVETTE-GRAND-SPORT-RELIABILITY/

     HTTPS://WWW.CORVETTEFORUM.COM/FORUMS/C7-GENERAL-

DISCUSSION/4161059-2018-GRAND-SPORT-CRACKED-RIM.HTML

HTTP://WWW.CARPROBLEMZOO.COM/CHEVROLET/CORVETTE/WHE
EL-PROBLEMS.PHP

t.  **DATE OF INCIDENT:** January 19, 2019
    **DATE COMPLAINT FILED:** January 21, 2019
    **NHTSA/ODI ID:** 11171195
    **SUMMARY:** THE WHEELS ON MY VEHICLE ARE CRACKED ON THE
    REAR PASSENGER SIDE. I PICKED UP MY (NEW) CAR FROM
    LAMARQUE AUTO DEALER IN NEW ORLEANS AND DROVE HOME TO
    BEAUMONT. WHEN I GOT TO BEAUMONT, THE LOW TIRE PRESSURE
    WARNING CAME ON. SO TODAY (1-21-19) I TOOK CAR TO DISCOUNT
    TIRE AND THEY FOUND THAT MY WHEEL IS CRACKED. I' ASSUMING
    IT CRACKED WHILE DRIVING OVER 200 MILES ON I-10 HEADED
    HOME.

u.  **DATE OF INCIDENT:** January 27, 2019
    **DATE COMPLAINT FILED:** February 20, 2019
    **NHTSA/ODI ID:** 11181387
    **SUMMARY:** 2017 CORVETTE GRAND SPORT, PURCHASED IN JUNE OF
    2017, ONLY USED ON WEEKEND AND THE CURRENT MILEAGE IS
    ONLY 930.

    JUST NOTICED A VIBRATION IN THE FRONT END WHEN TRAVEL ON
    HIGHWAY AT SPEED 55+.

    BRING THE CAR TO THE DEALERSHIP FOR INSPECTION AND THE
    SERVICE MANAGER INFORM ME ALL 4 WHEELS HAS BEEN BEND AND
    NEED TO BE REPLACE.

    FILE A CASE (9-5019078980) WITH GM CUSTOMER CARE CENTER AND
    AFTER 1 WEEK, GM CENTER CALLED AND TOLD ME THIS IS NOT
    COVER UNDER THE FACTORY WARRANTY. VERY DISAPPOINT AND
    LOOSING TRUST IN GM PRODUCT RELATED TO QUALITY,
    RELIABILITY AND SAFETY CONCERN FOR THE CONSUMERS.

    THIS PROBLEM WITH THE FACTORY WHEEL BENDING OR CRACKING
    HAS BEEN REPORT AND LISTED IN SEVERAL CORVETTE FORUM AND
    MOST ARE RELATED TO THE 2017-2019 GRAND SPORT MODEL.

    HOPEFULLY THERE WILL BE AN INVESTIGATION OPEN SOON TO
    PREVENT ANY FURTHER DAMAGE CAUSING SERIOUS ACCIDENT
    SIMILAR TO THE AIR BAG PROBLEMS.

v.  **DATE OF INCIDENT:** February 22, 2019
    **DATE COMPLAINT FILED:** March 1, 2019
    **NHTSA/ODI ID:** 11183573

**SUMMARY:** ON OR ABOUT SEPTEMBER 11, 2018 I NOTICED MY RIGHT FRONT TIRE WAS LOW ON AIR. I TOOK IT TO LES SCHWAB TIRE AND THEY REPAIRED A LEAK FROM A SCREW. A COUPLE OF DAYS LATER I NOTICED THE TIRE WAS STILL GOING LOW I TOOK IT BACK AND THEY INFORMED ME THAT IT HAD A CRACKED WHEEL. I PURCHASED A NEW WHEEL FROM CHEVROLET AND HAD LESS SCHWAB INSTALL IT FOR ME . I JUST RECENTLY 2/22/2019 PUT NEW TIRES ON THE CAR AND THE DEALERSHIP NOTED THE BRAND NEW WHEEL I PUT ON THE RIGHT REAR HAS CRACKS IN IT NOW AS WELL AS THE LEFT REAR WHEEL WHICH IS LOSING AIR. THESE WHEELS ARE EXPENSIVE I BELIEVE THEY RETAIL FOR $800 EACH AT THE DEALER AND ARE DEFECTIVE AND DANGEROUS. MOST OF OUR MILES ARE HIGHWAY MILES DRIVING BETWEEN SAN JOSE CALIFORNIA AND ELK GROVE CALIFORNIA BETWEEN MY OFFICES.

w. **DATE OF INCIDENT:** March 1, 2019
**DATE COMPLAINT FILED:** March 2, 2019
**NHTSA/ODI ID:** 11183598
**SUMMARY:** FACTORY WHEELS CRACKED FROM NORMAL DRIVING ON THE INNER LIP, TIRE MECHANIC ADVISED HE'S SEEN MANY OF THESE ON THE Z06 WHEELS AND IT'S A KNOWN PROBLEM HOWEVER GM WON'T COVER THE DEFECTIVE WHEELS UNDER WARRANTY. THE CRACKED WHEEL CAUSES A SLOW LEAK END EVENTUALLY CAN BREAK IF GONE UNDETECTED RESULTING IN A LOSS OF CONTROL OF THE VEHICLE.

x. **DATE OF INCIDENT:** March 18, 2019
**DATE COMPLAINT FILED:** April 10, 2019
**NHTSA/ODI ID:** 11195307
**SUMMARY:** CORVETTE REAR WHEEL WAS LOSING AIR SO INSPECTED TIRES AND FOUND NO HOLES. WENT TO CORVETTE FORUM TO LEARN THIS IS A KNOWN PROBLEM ON Z06 AND GRAND SPORTS. SEEMS GM HAS A PROBLEM WITH CRACKING. MY CRACK IS EXACTLY WHAT THE FORUM MEMBERS HAVE. HAIRLINE CRACK IN THE RIM ON THE NON-HUB SIDE. THIS IS A SAFETY ISSUE AS THE RIM COULD COME APART AT SPEED AND CAUSE A SERIOUS ACCIDENT. I HAVE NO OTHER DAMAGE TO THE WHEEL AND HAVE NOT HAD ANY CURB DAMAGE. I BABY THIS CAR AND THE SAME CRACK THAT MANY OTHERS HAVE EXPERIENCED APPEAR.

**Customer Complaints on Third-Party Websites**

82.     Consumers similarly complained about the defect on various online forums.

Below are some examples.

a. **August 31, 2017:** There have been a lot of reports of stock wheels bending on Grand Sports and Z06s here lately, and I've had one of my own front wheels bend

on a brand new Grand Sport. In my situation, there was absolutely no damage, scratch or even a mark anywhere - the wheel just went out of round with less than 1000 miles on the car.

Why is this happening, is Chevy aware of this happening on more than an isolated occurrence, and what is being done to remedy the situation? Will you improve the strength of these Chinese-made wheels and offer a recall/replacement? (*Available at* https://www.corvetteforum.com/forums/ask-tadge/4036656-asked-grand-sport-z06-wheels-bending.html)

b. **September 13, 2017:** I have 3 bent and one broken wheel and have never hit anything hard enough to do this kind of damage. Dealer did not diagnose the problem however did tell me to stop driving in sport mode. (*Id.*)

c. **September 20, 2017:** In for a response. We have had a few customers and a trade-in (all C7 Z's) with 3 or 4 bent wheels per car. Thankfully we have sourced a company that will repair the wheels, much cheaper than replacing. This is clearly a defect if this is as common as it seems. (*Id.*)

d. **October 20, 2017:** I have several [bent] rims, probably seven, I'll have to count all of them. They are all in the rear and none of them were from hitting anything that is worse than any other expansion joint or imperfection in the road. I'm very careful not to hit potholes. The roads I travel on are actually in very good shape. (*available at* https://www.corvetteforum.com/forums/c7-general-discussion/4056471-have-you-had-a-wheel-bend.html#post1595799836)

e. **October 20, 2017:** Five bent wheels within the first 2,700 miles. Currently have 6,700 miles on my C7Z. All were bent on public streets. The first four were all bent at the same time from a pothole that was kind of hidden in the shadows and I tried to straddle at about 35 mph, it didn't work. The fifth was a very minor bump coming off a freeway bridge at 55 mph. Couldn't feel any vibration until 45+ mph with any of these. (*Id.*)

f. **October 22, 2017:** Fast forward several months, I return to the same dealership regarding the vibration issue which had gotten progressively worse. At that time, the dealership informed me that all four rims were bent. I've since heard that driving in Sport mode could result in bent wheels. Available at (*Id.*)

g. **May 8, 2018:** Yes...I have just been informed by my dealer that My C7 Z06 has two bent wheels.
They caused the car to have a rythmic vibration. Only 3000 miles and no evidence of damage and I have no recollection of any road hazards hit. I noticed the vibration right after taking a very hard off ramp ! (*Id.*)

h. **June 20, 2018:** 2 front wheels bent on a 2017 GS. (*Id.*)

i. **June 20, 2018:** I took my 2017 GS in today for a vibration. They say all four

wheels are bent! (*Id.*)

j.  **June 24, 2018:** I had a shimmy in the steering wheel on my 2017 GS. It seems I had 3 bent wheels and a cracked wheel. Insurance company purchased through the dealer is being a real pain. They want to give me a $650 wheel for the one that was cracked even though the GM price is over $900 for the Chrome clad. The other 3 have been straightened and are perfect. Now to fight for a GM wheel and an alignment…. (*Id.*)

k.  **June 27, 2018:** The verdict is in, they tell me that 3 of the wheels are BENT?!? I haven't even hit as much as a pothole and 3 of the 4 wheels are bent?!?! WTF?!?!

The LR wheel and both Right (Front and Rear) are bent according to the dealer. They said that one of the right ones, I'm so pissed I don't even remember which one they told me, was so bent that you didn't have to spin it to see it. And OF COURSE they are not covered under warranty. (*Id.*)

l.  **June 28, 2018:** 2018 GS had all 4 wheels bent and a cracked one also, I believe from potholes at highway speeds. Drove it from Maryland to Colorado. Put new Z06 style wheels on and waiting for an answer from the T&W insurance. Couldn't wait for them to make a decision and not drive my car. Now it rides fantastic. (*Id.*)

m.  **October 11, 2018:** I have a 2017 GrandSport Corvette, 10K miles. Purchased 10/20/17. I have bent a total of 6 rims. First 2 rims were bent in May. All 4 rims were bent in June.
My insurance replaced the first 2 bent rims with new ones. I hit a small pothole on the highway. I was shock that the rims bent so easy. The next month I bent all 4 rims, paid $700 to get the 4 bent rims straighten, trying to save money. The 4 rims later kept re-bending so I lost my money. I ended up just purchasing forged rims from Cray. I have owned 3 corvettes; I have never bent rims until I purchased this car. Corvette should be ashamed of themselves putting cheap rims on a car that cost this much money. All the C7 (GS, Z06) owners should get together to file a case action suit against them. That is the only way to get someone to listen. (*Id.*)

n.  **November 16, 2018:** Three bent GS wheels. Don't use Sport mag ride setting anymore. One wheel straightened and bent again. Dealer (Penske) wouldn't cover it. Replacement wheel from Midwest $ 485 + shipping each. These wheels are noodles! (*Id.*)

o.  **November 16, 2018:** My 4 bent rims had no tire damage, all rims were bent on inside bead, no rim damage other than being egg shaped, no tire or rim damage tells me the rims are not up to what roads in the USA are like. (*Id.*)

p.  **November 16, 2018:** Bought my 2016 Z with 30K miles and a cracked rear wheel was found at inspection. (*Id.*)

q.  **November 26, 2018:** Left Rear, Right Front, and Right Rear, on a Grand Sport

Collector Edition. (*Id.*)

83.     GM had superior and exclusive knowledge of the Wheel Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

84.     Plaintiffs are informed and believe and based thereon allege that before Plaintiffs purchased their respective Class Vehicles, and since 2015, GM knew about the Wheel Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to GM and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from GM dealers about the problem.

85.     GM is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, GM conducts tests, including pre-sale durability testing, on incoming components, including the wheels, to verify the parts are free from defect and align with GM's specifications.[5] Thus, GM knew or should have known that the subject wheels were defective and prone to put drivers in a dangerous position due to the inherent risk of the defect.

86.     Additionally, GM should have learned of this widespread defect from the sheer number of reports received from dealerships and from customer complaints directly to GM. GM's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

87.     Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Defendant's policy that when

---

[5] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed September 11, 2017).

a repair is made under warranty the dealership must provide GM with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to GM, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

88.     The existence of the Wheel Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiffs and other Class Members known of the Wheel Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

89.     On information and belief, the Wheel Defect has been so prevalent that the Wheels at issue have been subject to multiple months-long back orders for replacements.

90.     Reasonable consumers, like Plaintiff, reasonably expect that a vehicle's wheels are safe, will function in a manner that will not pose a safety risk, and are free of defects. Plaintiffs and Class Members further reasonably expect that GM will not sell or lease vehicles with known safety defects, such as the Wheel Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect GM to fail to disclose the Wheel Defect to them and to continually deny it.

**GM Has Actively Concealed the Wheel Defect**

91.     Despite its knowledge of the Wheel Defect in the Class Vehicles, GM actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, GM failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)     any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the wheels;

(b)     that the Class Vehicles, including the wheels, were not in good in working order, were defective, and were not fit for their intended purposes; and

(c)     that the Class Vehicles and the wheels were defective, despite the fact

that GM learned of such defects as early as 2015.

92.     As discussed above, GM monitors its customers' discussions on online forums such as www.corvetteforum.com, and actively concealed the defect by denying the existence of a defect and blaming the class members for the problems.

93.     When consumers present their Class Vehicles to an authorized GM dealer for rim repairs or replacements, GM refuses to honor the 3-year, 36,000-mile warranty, telling the customers that the rim failures are the customers' fault.

94.     Accordingly, despite GM's knowledge of the Wheel Defect, GM has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' rims.

## CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

96.     The Classes are defined as:

**Nationwide Class:** All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**California Class**:   All individuals who purchased or leased any 2015 to 2019 model year Chevrolet Corvette Z06 or 2017 to 2019 model year Chevrolet Corvette Grand Sport vehicle in the State of California.

**CLRA Sub-Class:** All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**New Hampshire Class:** All individuals who purchased or leased any 2015 to 2019 model year Chevrolet Corvette Z06 or 2017 to 2019 model year Chevrolet Corvette Grand Sport vehicle in the State of New Hampshire.

**Michigan Class:** All individuals who purchased or leased any 2015 to 2019 model year Chevrolet Corvette Z06 or 2017 to 2019 model year Chevrolet Corvette Grand Sport vehicle in the State of

29

Michigan.

97.     Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

98.     Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

99.     Typicality: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM. The representative Plaintiffs, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective wheels. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

100.    Commonality: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)     Whether Class Vehicles suffer from defects relating to the wheels;

(b)     Whether the defects relating to the wheels constitute an unreasonable safety risk;

30

(c)     Whether Defendant knows about the defects pertaining to the wheels and, if so, how long Defendant has known of the defect;

(d)     Whether the defective nature of the wheels constitutes a material fact;

(e)     Whether Defendant has a duty to disclose the defective nature of the wheels to Plaintiffs and Class Members;

(f)     Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

(g)     Whether Defendant knew or reasonably should have known of the defects pertaining to the wheels before it sold and leased Class Vehicles to Class Members;

(h)     Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective wheels;

(i)     Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective wheels;

(j)     Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act; and

(k)     Whether Defendant breached written warranties pursuant to the Magnuson-Moss Warranty Act.

101.    Adequate Representation: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and they intend to prosecute this action vigorously.

102.    Predominance and Superiority: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and

wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**

**(Violation of California's Consumers Legal Remedies Act,**

**California Civil Code § 1750, *et seq*.)**

103.    Plaintiff Holguin incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

104.    Plaintiff Holguin brings this cause of action on behalf of himself and the CLRA Sub-Class.

105.    Defendant is a "person" as defined by California Civil Code § 1761(c).

106.    Plaintiff and CLRA Sub-class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

107.    By failing to disclose and concealing the defective nature of the wheels from Plaintiff and prospective Class Members, Defendant violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their wheels had characteristics and benefits that they do not have and represented that the Class Vehicles and their wheels were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

108.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

109.   Defendant knew that the Class Vehicles and their wheels suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

110.   Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

111.   Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the wheels and/or the associated repair costs because:

        (a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' wheels;

        (b)   Plaintiff and Class Members could not reasonably have been expected to learn or discover that their wheels had a dangerous safety defect until it manifested; and

        (c)   Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn of or discover the safety defect.

112.   In failing to disclose the defective nature of wheels, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

113.   The facts Defendant concealed from or failed to disclose to Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less.  Had Plaintiff and Class Members known that the Class Vehicles' wheels were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

114.   Plaintiff and Class Members are reasonable consumers who do not expect the

wheels installed in their vehicles to exhibit problems such as the Wheel Defect. This is the reasonable and objective consumer expectation relating to a vehicle's wheels.

115.    Because of Defendant's conduct, Plaintiff and Class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Wheel Defect.

116.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages.

117.    Plaintiff and the Class are entitled to equitable relief.

118.    Plaintiff's Declaration of Venue is attached hereto as Exhibit 1.

119.    Plaintiff provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). Defendant failed to provide appropriate relief for its violations of the CLRA within 30 days. Accordingly, Plaintiff seeks monetary, compensatory, and punitive damages, in addition to equitable and injunctive relief.

## SECOND CAUSE OF ACTION

### (Violation of California Business & Professions Code § 17200, *et seq.*)

120.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

121.    Plaintiff Holguin brings this cause of action on behalf of himself and the California Class.

122.    Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

123.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

124.   Plaintiff and Class Members are reasonable consumers who do not expect their wheels to warp and crack.

125.   Defendant knew the Class Vehicles and their wheels were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

126.   In failing to disclose the Wheel Defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

127.   Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles and their wheels because:

> (a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' wheels; and

> (b)   Defendant actively concealed the defective nature of the Class Vehicles and their wheels from Plaintiff and the Class.

128.   The facts Defendant concealed from or failed to disclose to Plaintiff and Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had they known of the Wheel Defect, Plaintiff and the other Class Members would have paid less for Class Vehicles equipped with the subject wheels or would not have purchased or leased them at all.

129.   Defendant continued to conceal the defective nature of the Class Vehicles and their wheels even after Class Members began to report problems.

130.   Defendant's conduct was and is likely to deceive consumers.

131.   Defendant's acts, conduct, and practices were unlawful, in that they constituted:

> (a)   Violations of California's Consumers Legal Remedies Act;

> (b)   Violations of the Song-Beverly Consumer Warranty Act;

> (c)   Violations of the Magnuson-Moss Warranty Act; and

> (d)   Breach of Express Warranty under California Commercial Code section 2313.

132.   By its conduct, Defendant has engaged in unfair competition and unlawful,

unfair, and fraudulent business practices.

133.    Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

134.    As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

135.    Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and the Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.

### THIRD CAUSE OF ACTION

### (Breach of Implied Warranty Pursuant to Song-Beverly

### Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*)

136.    Plaintiff Holguin incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

137.    Plaintiff Holguin brings this cause of action against Defendant on behalf of himself and the California Class.

138.    Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

139.    Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

140.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a

36

warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

141.     Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the defective wheels.

142.     The alleged Wheel Defect is inherent and was present in each Class Vehicle at the time of sale.

143.     Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

144.     Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

### FOURTH CAUSE OF ACTION

### (Breach of Express Warranty

### pursuant to Cal. Com. Code §§ 2313, 10210)

145.     Plaintiff Holguin incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

146.     Plaintiff Holguin brings this cause of action on behalf of himself and on behalf of the California Class against Defendant.

147.     Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under California law.

148.    The wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

149.    In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

150.    According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

151.    Defendant breached the express warranties by selling and leasing Class Vehicles with wheels that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the wheels. In addition, when Defendant did agree to pay a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing Plaintiff's and Class Members' defective wheels with similarly defective wheels, thus failing to "repair" the defect.

152.    Plaintiff was not required to notify GM of the breach or was not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the wheels, and from other internal sources.

153.    As a direct and proximate cause of Defendant's breach, Plaintiff and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

154.    Plaintiff and the other Class Members are entitled to legal and equitable relief

38

against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**FIFTH CAUSE OF ACTION**

**(Violations of New Hampshire Consumer Protection Act**

**N.H. REV. STAT. ANN. section 358-A:1, *et seq.*)**

155.    Plaintiffs David Goldberg and Robert and Carole Smith, individually and on behalf of the New Hampshire Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

156.    Plaintiffs David Goldberg and Robert and Carole Smith bring this claim individually and on behalf of the New Hampshire Class against Defendant.

157.    Plaintiffs, the New Hampshire class members, and Defendant are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire PA"). N.H. Rev. Stat. § 358-A:1.

158.    Defendant's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

159.    The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but ... not limited to, the following: ... (V) Representing that goods or services have ... characteristics, ... uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, ... if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

160.    In the course of its business, Defendant concealed and suppressed material facts concerning the Corvette. Defendant failed to disclose the Wheel Defect. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and lease of Corvette vehicles.

161.     Defendant owed Plaintiffs and the New Hampshire Class a duty to disclose the true nature of the Corvettes because Defendant: (a) possessed exclusive knowledge about the defect; (b) intentionally concealed the foregoing from Plaintiffs and the New Hampshire Class; and (c) made incomplete representations about the Corvette, while purposefully withholding material facts from Plaintiffs and the New Hampshire Class that contradicted these representations.

162.     Defendant knew about the Wheel Defect at time of sale and lease. Defendant acquired additional information concerning the Wheel Defect after the Corvettes were sold and leased but continued to conceal information.

163.     Defendant thus violated the New Hampshire CPA by, at a minimum, employing deception, deceptive acts or practices, fraud, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale and lease of the Class Vehicles.

164.     Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent mislead Plaintiffs and the New Hampshire Class members.

165.     Defendant knew or should have known that its conduct violated the New Hampshire CPA.

166.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

167.     Plaintiffs and the New Hampshire Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the New Hampshire Class members who purchased or leased the Class Vehicles would not have purchased or leased them or would have paid significantly less for them if the Wheel Defect had been disclosed.

168.     Defendant had an ongoing duty to Plaintiffs and the New Hampshire Class to refrain from unfair and deceptive practices under the New Hampshire CPA. All owners of the

Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

169.    Defendant's violations present a continuing risk to Plaintiffs, the New Hampshire Class, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

170.    As a direct and proximate result of Defendant's violations of the New Hampshire CPA, Plaintiffs and the New Hampshire Class have suffered injury-in-fact and/or actual damage.

171.    Because Defendant's willful conduct caused injury to Plaintiffs and the New Hampshire Class members' property through violations of the New Hampshire CPA, Plaintiffs and the New Hampshire Class seek recovery of actual damages or $1,000 each, whichever is greater, treble damages, costs, and reasonable attorneys' fees, an order enjoining Defendant's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## SIXTH CAUSE OF ACTION

### (Breach of Express Warranty

### N.H. REV. STAT. §§ 382-A:2-313 and 382-A:2A-210, *et seq.*)

172.    Plaintiffs David Goldberg and Robert and Carole Smith, individually and on behalf of the New Hampshire Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

173.    Plaintiffs David Goldberg and Robert and Carole Smith bring this claim individually and on behalf of the New Hampshire Class against Defendant.

174.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and a "seller" of motor vehicles under § 382-A:2-103(1)(d).

175.    With respect to leases, Defendant is and was at all relevant times a "lessor" of

motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

176.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 2A-103(1)(h).

177.    The wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

178.    In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

179.    According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the first 3 years or 36,000 miles, whichever comes first."

180.    Defendant's NVLW and warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiffs and the New Hampshire Class members purchased or leased the Class Vehicles with defective wheels.

181.    Plaintiffs and the New Hampshire Class members experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiffs and the New Hampshire Class members that the Class Vehicles were equipped with defective wheels.

182.    Defendant breached the express warranty promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

183.    Plaintiffs reported their wheel issue to Defendant. In addition, Defendant was provided with notice of these issues by numerous NHTSA and consumer complaints filed

against it, including the instant Complaint and similar legal proceedings, and has actual knowledge of the defect.

184.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and the New Hampshire Class members have been damaged in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION

### (Breach of Implied Warranty of Merchantability

### N.H. REV. STAT. §§ 382-A:2-314 and 382-A:2A-212, *et seq.*)

185.    Plaintiffs David Goldberg and Robert and Carole Smith, individually and on behalf of the New Hampshire Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

186.    Plaintiffs David Goldberg and Robert and Carole Smith bring this claim individually and on behalf of the New Hampshire Class against Defendant.

187.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and a "seller" of motor vehicles under § 382-A:2-103(1)(d).

188.    With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

189.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 2A-103(1)(h).

190.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

191.    Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class

Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

192.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

193.    Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the defective wheels.

194.    The alleged Wheel Defect is inherent and was present in each Class Vehicle at the time of sale.

195.    Because of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

196.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the New Hampshire Class members have been damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Violations of the Michigan Consumer Protection Act

### MICH. COMP. LAWS § 445.903, *et seq.*)

197.    Plaintiff James Kalkstein, individually and on behalf of the Michigan Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

198.    Plaintiff Kalkstein brings this claim individually and on behalf of the Michigan Class against Defendant.

199.    Plaintiff and the Michigan Class members are "person[s]" within the meaning of the Mich. Comp. Laws. § 445.902(1)(d).

200.    At all relevant times, Defendant was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

201.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits ""[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce ...." Mich. Comp. Laws § 445.903(1).

202.    Defendant engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have ... characteristics ... that they do not have ....;" "(e) Representing that goods or services are of a particular standard ... if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

203.    In the course of its business, Defendant concealed and suppressed material facts concerning the Corvette's wheels. Defendant failed to disclose the existence of the Wheel Defect. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and lease of Class Vehicles.

204.    Defendant knew the Class Vehicles and their wheels were defectively designed

or manufactured, would fail prematurely, and were not suitable for their intended use.

205.    Defendant owed Plaintiff and the Michigan Class a duty to disclose the Wheel Defect because Defendant: (a) possessed superior and exclusive knowledge about the defect; (b) intentionally concealed the foregoing from Plaintiff and the Michigan Class; and (c) made incomplete representations about the Corvette while intentionally withholding material facts from Plaintiff and the Michigan Class that contradicted these representations.

206.    Defendant's omissions were material because they were likely to deceive reasonable consumers.

207.    Defendant acted intentionally, knowingly, and maliciously to violate Michigan's CPA, and recklessly disregard Plaintiff's and the Michigan Class members' rights. Defendant's knowledge of the Wheel Defect put it on notice that the Corvette was not as advertised. Defendant's violations present a continuing risk to Plaintiff, the Michigan Class members, as well as the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

208.    As a direct and proximate result of Defendant's violations of the Michigan CPA, Plaintiff and the Michigan Class members have suffered injury-in-fact and/or actual damage.

209.    Plaintiff and the Michigan Class members seek injunctive relief to enjoin Defendant from continuing its unfair and deceptive acts; monetary damages against Defendant measures as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

210.    Plaintiff and the Michigan Class members also seek punitive damages against Defendant because Defendant's conduct evidences an extreme deviation from reasonable standards. Defendant flagrantly, maliciously, and fraudulently misrepresented the reliability of the Class Vehicles, deceived Michigan Class members, and concealed material facts that only

it knew. Defendant's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## NINTH CAUSE OF ACTION

### (Breach of Express Warranty

### MICH. COMP. LAWS §§ 440.2313 and 440.2860)

211.    Plaintiff James Kalkstein, individually and on behalf of the Michigan Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

212.    Plaintiff James Kalkstein brings this claim individually and on behalf of the Michigan Class against Defendant.

213.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

214.    With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws. S 440.2803(1)(p).

215.    247. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

216.    The wheels were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

217.    In a section entitled "What is Covered," Defendant's express warranty provides in relevant part that "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." The warranty further provides that "Warranty repairs, including, including towing, parts, and labor, will be made at no charge" and "[t]o obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."

218.    According to GM, the "Bumper-to-Bumper (Includes Tires) Coverage is for the

first 3 years or 36,000 miles, whichever comes first."

219.    Defendant's NVLW and warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiffs and the Michigan Class members purchased or leased the Class Vehicles with defective wheels.

220.    Plaintiff and the Michigan Class members experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiff and the Michigan Class members that the Class Vehicles were equipped with defective wheels.

221.    Defendant breached the express warranty promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

222.    Plaintiff reported his wheel failures to Defendant. In addition, Defendant was provided with notice of these issues by numerous NHTSA and consumer complaints filed against it, including the instant Complaint and similar legal proceedings, and has actual knowledge of the defect.

223.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and the Michigan Class members have been damaged in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**

**(Breach of Implied Warranty of Merchantability**

**MICH. COMP. LAWS §§ 440.2314 and 440.2860)**

224.    Plaintiff James Kalkstein, individually and on behalf of the Michigan Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Class Action Complaint as if fully set forth herein.

225.    Plaintiff Kalkstein brings this claim individually and on behalf of the Michigan Class against Defendant.

226.    Defendant is and was at all relevant times a "merchant" with respect to motor

vehicles under Mich. Comp. Laws § 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

227.    With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws. S 440.2803(1)(p).

228.    258. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

229.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

230.    Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their wheels suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

231.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels, which were manufactured, supplied, distributed, and/or sold by GM, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use.

232.    Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the defective wheels.

233.    The alleged Wheel Defect is inherent and was present in each Class Vehicle at the time of sale.

234.    Because of Defendant's breach of the applicable implied warranties, owners

and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Wheel Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' wheels are substantially certain to fail before their expected useful life has run.

235.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the New Hampshire Class members have been damaged in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### (Breach of Written Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq.*)

236.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

237.    Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendant.

238.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

239.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

240.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

241.    Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

242.    As set forth *supra* and incorporated by reference, Defendant extended a 36-month, 36,000 mile Bumper-to-Bumper warranty.

243.    Defendant breached the express warranties by selling and leasing Class Vehicles with wheels that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge,

the wheels. In addition, when Defendant did agree to pay a portion of the costs, Defendant nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective wheels with similarly defective wheels, thus failing to "repair" the defect.

244.    Defendant's breach of the express warranties has deprived the Plaintiffs and Class members of the benefit of their bargain.

245.    Defendant's breach of express warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

246.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

247.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the wheels.

248.    As a direct and proximate cause of Defendant's breach of written warranties, Plaintiff and Class Members sustained and incurred damages and other losses in an amount to be determined at trial.  Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

## TWELFTH CAUSE OF ACTION

### (Breach of Implied Warranty under the Magnuson-Moss Warranty Act,

### 15 U.S.C. § 2303 *et seq*.)

249.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

250.    Plaintiffs brings this cause of action on behalf of themselves and the Class against Defendant.

251.    The Class Vehicles are a "consumer product" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

252.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

253.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

254.    GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their wheels were manufactured, supplied, distributed, and/or sold by GM would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their wheels would be fit for their intended use while the Class Vehicles were being operated.

255.    Contrary to the applicable implied warranties, the Class Vehicles and their wheels at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design of their wheels.

256.    Defendant's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

257.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

258.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the wheels.

259.    As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance,

diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

260.    Because of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

### TENTH CAUSE OF ACTION

### (For Unjust Enrichment)

261.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

262.    Plaintiffs bring this cause of action on behalf of themselves and the Class.

263.    As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

264.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

265.    Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

266.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

### PRAYER FOR RELIEF

267.    Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a)    An order certifying the proposed Class, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

(a)     A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the wheels, including the need for periodic maintenance;

(b)     An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective wheels with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(c)     An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(d)     Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(e)     A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

(f)     An award of attorneys' fees and costs, as allowed by law;

(g)     An award of pre-judgment and post-judgment interest, as provided by law;

(h)     Leave to amend the Complaint to conform to the evidence produced at trial; and

(i)     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

268.    Plaintiffs hereby demand a trial by jury of all issues in this action so triable.


Dated:  May 6, 2020                              Respectfully submitted,

                                                 Attorneys for Plaintiffs,


                                                 By: /s/ *Russell D. Paul*_____
                                                 Russell D. Paul (Del. Bar No. 4647)
                                                 Amey J. Park (*PHV application forthcoming*)
                                                 **BERGER MONTAGUE PC**
                                                 1818 Market Street, Suite 3600
                                                 Philadelphia, PA 19103
                                                 Tel.:    (215) 875-3000
                                                 Fax:     (215) 875-4604
                                                 Email:  rpaul@bm.net
                                                            apark@bm.net

                                                 **CAPSTONE LAW APC**
                                                 Steven R. Weinmann (PHV app. forthcoming)
                                                 Tarek H. Zohdy (PHV app. forthcoming)
                                                 Cody R. Padgett (PHV app. forthcoming)
                                                 Trisha K. Monesi (PHV app. forthcoming)
                                                 1875 Century Park East, Suite 1000
                                                 Los Angeles, California 90067
                                                 Telephone:    (310) 556-4811
                                                 Facsimile:     (310) 943-0396
                                                 Steven.Weinmann@capstonelawyers.com
                                                 Tarek.Zohdy@capstonelawyers.com
                                                 Cody.Padgett@capstonelawyers.com
                                                 Trisha.Monesi@capstonelawyers.com